UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MELISSA CONCEPCION,

                              Plaintiff,

          -against-

UNITED STATES OF AMERICA,

                              Defendant.

**MEMORANDUM & ORDER**
**23-CV-9219 (NGG) (TAM)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Melissa Concepcion ("Plaintiff") brings this action against Defendant United States of America (the "Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, seeking damages for the conditions of confinement he endured and the alleged mistreatment he suffered as a transgender inmate in the custodial care of the Federal Bureau of Prisons (the "BOP"). [1] (*See generally* Am. Compl. (Dkt. 16).) Plaintiff seeks to hold the Government liable for the failures of BOP employees to provide basic care and supervision while acting within their scope of employment at two federal prison facilities in New York. Specifically, Plaintiff asserts claims for: (1) negligence, (*id.* ¶¶ 83-97); (2) negligent infliction of emotional distress, (*id.* ¶¶ 98-113); and (3) negligent hiring, retention, training, and supervision, (*id.* ¶¶ 114-21) (respectively, "Count 1," "Count 2," and "Count 3").

Pending before the court is the Government's partial motion to dismiss Count 2 and Count 3 pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, or alternatively, Rule 12(b)(6) for failure to state a claim. (*See*

---

[1] Plaintiff is a transgender man who uses he/him pronouns. (Am. Compl. (Dkt. 16) ¶ 21.)

*generally* Def.'s Partial Mot. to Dismiss ("Def.'s Mot.") (Dkt. 20-1); Pl.'s Opp. (Dkt. 20-2); Def.'s Reply (Dkt. 20-3).)

For the reasons explained below, the Government's motion to dismiss is GRANTED in part and DENIED in part.

## I. BACKGROUND[2]

### A. The Parties

Plaintiff is a transgender man who suffers from asthma and gender dysphoria—the latter being a "serious medical condition" including "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's assigned sex at birth." (*Id.* ¶¶ 37, 21-22.) The distress and discomfort arising from gender dysphoria can be managed and alleviated through treatment, including by dressing in accordance with one's gender identity. (*Id.* ¶ 23.) For Plaintiff, who has worn masculine clothing from a young age, dressing in accordance with his gender identity is "a medically necessary treatment." (*Id.* ¶¶ 21, 23.) Plaintiff suffered childhood abuse on the basis of his gender identity. (*Id.* ¶ 24.)

The Government, through the BOP, operates two prison facilities in New York: the Metropolitan Correctional Center ("MCC") in Manhattan and the Metropolitan Detention Center ("MDC") in Brooklyn. (*Id.* ¶¶ 8-9.) The BOP oversees the management and regulation of all federal penal and correctional institutions (including the MCC and MDC), and is prescribed certain duties

---

[2] The facts are taken from Plaintiff's Amended Complaint, filed on June 22, 2024—the complaint at issue here. (*Id.*) The court summarizes the Amended Complaint's factual allegations and for the purposes of the Government's motion, accepts them as true, drawing all reasonable factual inferences in favor of Plaintiff as the non-moving party. *See Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (Rule 12(b)(1)); *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021) (Rule 12(b)(6)).

under federal law, including the duty to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." (*Id.* ¶ 85 (quoting 18 U.S.C. § 4042(a)(2)).) The Government, acting through the BOP, is also responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters including at the MCC and MDC, as well as for the hiring, retention, training, supervision, discipline, and conduct of all BOP personnel. (*Id.* ¶ 9.)

### B.  Factual Background

At all times relevant to this motion, Plaintiff was a person in the care and custody of the Government. For approximately 600 days between August 27, 2020 and April 19, 2022, Plaintiff was incarcerated at two BOP facilities—first at the MCC and then at the MDC.[3] (*Id.* ¶ 17.)

#### 1.  Plaintiff's Conditions of Confinement

Plaintiff alleges that the Government breached its duty of care to him as a person in custody by subjecting him to "filthy, unsafe, and degrading conditions of . . . confinement" throughout his incarceration. (*Id.* ¶ 91; *see also id.* ¶¶ 1-2, 85 (defining the Government's duty by reference to 18 U.S.C. § 4042).)

During Plaintiff's incarceration, toilets failed, black mold covered shower walls, and rats crawled on beds. (*Id.* ¶¶ 33, 35, 36.) During one two-month period, Plaintiff ate "raw or incompletely cooked food" because of broken kitchen equipment, which he alleges, "BOP failed to fix." (*Id.* ¶¶ 33-34.) At the MCC, for example, a sewer pipe burst and flooded his unit with "foul water." (*Id.*

---

[3] The Amended Complaint states that Plaintiff was incarcerated "first [at] the MCC and then the MDC." (Am. Compl. ¶ 7.) However, it does not identify when exactly he was transferred from the MCC to the MDC and does not always specify in which of the two facilities the alleged conduct occurred. (*See, e.g., id.* ¶¶ 28, 32, 33-36, 38, 42-51.)

¶ 30.) At the MDC, he repeatedly only had access to "foul and dark-colored" drinking water, including for three weeks between December 2021 and January 2022. (*Id.* ¶¶ 31, 32.) For one eight-day period, Plaintiff was forced to sleep on a urine-soaked bed without medical care, hot food and water, or sufficient heat—all while sick with COVID-19. (*Id.* ¶¶ 28, 56, 59.)

Plaintiff alleges that BOP staff should have known that he was at particular risk from these unsanitary conditions due to his pre-existing asthma, which was documented in his BOP medical records. (*Id.* ¶¶ 36-37.) Plaintiff also made multiple complaints about these conditions. (*Id.* ¶ 38.) His complaints went un-addressed, and the BOP took no steps to ensure his well-being or his safety. (*Id.* ¶ 39.)

2.    Plaintiff's Treatment as a Transgender Inmate

Plaintiff also alleges that the Government breached its duty of care to him as a transgender person in custody "by subjecting him to extremely harmful harassment, abuse, and discrimination on the basis of his gender identity" in violation of the Prison Rape Elimination Act ("PREA"), 34 U.S.C. §§ 30301 *et seq.*, and its implementing regulations.[4] (Am. Compl. ¶ 105; *see also id.* ¶¶ 40-

---

[4] The court is not bound to accept the Amended Complaint's statements to the extent that they amount to conclusions of law. *See Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). Here, for example, the court is not bound to accept as true Plaintiff's conclusory allegations that BOP employees engaged in "unlawful" gender-based "discrimination," "harassment," "abuse," and "retaliation." (*See, e.g.,* Am. Compl. ¶¶ 19 (alleging Plaintiff endured "unlawful treatment . . . as a transgender person in custody"), 65 (alleging Plaintiff endured "harassment and discrimination on the basis of sex and gender identity").) However, the court finds that the factual allegations contained in the Amended Complaint raise "more than the mere possibility," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), that the challenged conduct amounts to unlawful "sexual harassment" as defined in the PREA and as covered by the BOP's Sexually Abusive Behavior Prevention

41, 53 (defining the Government's duty in reference to 28 C.F.R. § 115.6 and BOP, Program Statement No. 5324.11, Sexually Abusive Behavior Prevention and Intervention Program (2014) (the "PREA Regulations")).) Further, Plaintiff alleges that the Government breached its duty of care to him as a transgender inmate by denying him a "medically necessary treatment" in violation of the BOP's Transgender Offender Manual. (*Id.* ¶¶ 23, 40-41; *see also id.* ¶ 43 (defining the Government's duty in reference to BOP, Program Statement No. 5200.04, Transgender Offender Manual 11 (2017) (the "BOP Transgender Offender Policy")).)

Plaintiff alleges that BOP employees: engaged in deliberate and sustained gender-based discrimination and harassment; verbally abused him on the basis of his gender identity; and retaliated against him when he filed complaints and grievances reporting this conduct. BOP staff "regularly harassed" Plaintiff with "transphobic, hateful remarks." (*Id.* ¶ 50.) For example, BOP staff told Plaintiff he had "a devil inside of him" and that he would "rediscover his womanhood" upon his release. (*Id.* ¶ 51.) Starting in August 2021, BOP staff refused to give Plaintiff gender-affirming undergarments—despite his numerous requests, (*id.* ¶¶ 42, 45-46), and despite the BOP's alleged policy that "gender-appropriate undergarments must be made available to transgender people in custody," (*id.* ¶ 43 (citing the BOP Transgender Offender Policy)). Plaintiff's requests were either ignored or rejected, and he "was forced to wear women's underwear that did not match his gender identity and exacerbated his gender dysphoria." (*Id.* ¶¶ 44-46, 48.)

---

and Intervention Program Statement. *See* 28 C.F.R. § 115.6 (defining "sexual harassment" to include "[r]epeated verbal comments or gestures of a sexual nature to an inmate . . . by a staff member, contractor, or volunteer, including demeaning references to gender. . ."); BOP, Program Statement No. 5324.11, Sexually Abusive Behavior Prevention and Intervention Program (2014) (the "PREA Regulations") (incorporating the PREA's definition of "sexual harassment").

When Plaintiff made complaints about BOP employees' mistreatment of him as a transgender inmate, he alleges that BOP staff retaliated against him. (*Id.* ¶ 60.) For example, Plaintiff alleges that one male officer attempted to mace him, and that after Plaintiff filed an administrative grievance, that same officer physically discarded the grievance in front of Plaintiff and said he could treat Plaintiff however he wanted. (*Id.* ¶¶ 61-62.) In another instance, Plaintiff alleges that a "unit manager" told him that BOP staff had refused to return his towel because they believed Plaintiff "had complained to his attorneys" about their mistreatment of him. (*Id.* ¶ 63.) Plaintiff alleges that through these actions, BOP staff violated BOP policy, exacerbated his gender dysphoria, and caused him to suffer emotional distress and other emotional injuries. (*Id.* ¶ 65.)

Further, Plaintiff alleges that these violations of BOP policy and his resulting harms persisted throughout his incarceration because of the failures of "high ranking and supervisorial officials at [the] MCC and MDC, including the Warden" to "respond to previous allegations of mistreatment due to [Plaintiff's] gender," and to otherwise follow "mandatory BOP policies for preventing and responding to discrimination, harassment, and abuse on the basis of sex and gender identity." (*Id.* ¶¶ 40-41, 81-82.)

Plaintiff alleges that the Government and BOP staff were aware of the risk of harm to transgender people in federal custody due to the existence of the PREA Regulations and the BOP Transgender Offender Policy's mandatory requirements and guidelines for the care of transgender inmates. (*Id.* ¶ 79.) Plaintiff also alleges that BOP staff knew or should have known that he was at particular risk of harm due to his history of gender-based abuse, his gender dysphoria, and his unique medical needs as a transgender person, (*id.* ¶¶ 3, 25-26, 54-55), including that he

was at particular risk from being denied gender-affirming undergarments because for Plaintiff, "dressing in accordance with [his] gender identity is a medically necessary treatment," (*id.* ¶ 23).

### C.  Procedural History

Plaintiff initially filed this action on December 15, 2023. (*See* Compl. (Dkt. 1).) On June 22, 2024, following a pre-motion conference regarding the Government's anticipated motion to dismiss, Plaintiff filed his Amended Complaint—the pleading at issue here. On August 9, 2024, the Government filed its partial motion to dismiss Count 2 and Count 3, which was fully briefed on September 13, 2024. (*See* Def.'s Mot.; Pl.'s Opp.; Def.'s Reply.) The Government did not move to dismiss Count 1, and the parties continue to engage in discovery before Magistrate Judge Taryn A. Merkl. (*See* Text Order Dated 6/30/2025.) On June 30, 2025, Magistrate Judge Merkl referred the case to mediation. (Min. Entry Dated 6/30/2025.)

## II.  LEGAL STANDARD

Rule 12(b)(1) permits a defendant to move to dismiss an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion may be either fact-based or facial. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). As relevant here, when the motion is directed to the face of the complaint, the court must accept all uncontroverted allegations as true and draw every reasonable inference in favor of the plaintiff. *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). Also as relevant here, "[i]n any suit in which the United States is a defendant, there must be . . . subject matter jurisdiction, and a waiver of sovereign immunity." *Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. and Urb. Dev.*, 175 F.3d 132, 139 (2d Cir. 1999); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the

United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").[5]

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016); *see also Al-Khazraji v. United States*, 519 F. App'x 711, 713 (2d Cir. 2013) (summary order) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence, and the United States' waiver of immunity under the FTCA is to be strictly construed in favor of the government."). In cases such as this one, a "plaintiff bears the burden of establishing that her claims fall within an applicable waiver" of sovereign immunity. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In addition, a plaintiff "also bear[s] the initial burden of showing that [her] claims are not barred by [an] . . . exception" to the applicable waiver. *Cangemi v. United States*, 13 F.4th 115, 129 (2d Cir. 2021). In other words, although the court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff, . . . jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to

---

[5] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted and all alterations are adopted.

relief[.]"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint must contain facts that do more than present a "sheer possibility that a defendant has acted unlawfully." *Id.*

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Allegations that "are no more than conclusions . . . are not entitled to the assumption of truth." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). Thus, a complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

"In most cases, a plaintiff's failure to state a claim under Rule 12(b)(6) does not deprive a federal court of subject-matter jurisdiction." *Brownback v. King*, 592 U.S. 209, 217 (2021). However, "in the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." *Id.* In other words, because the FTCA functions as a waiver of sovereign immunity, a finding that a particular FTCA claim fails on the merits also deprives the court of subject-matter jurisdiction.[6] *Id.* As a result, in an FTCA action, if a "plaintiff fails to plausibly allege an element that is both a

---

[6] For example, "a plaintiff must plausibly allege that 'the United States, if a private person, would be liable to the claimant' under state law *both* to survive a merits determination under Rule 12(b)(6) *and* to establish subject-matter jurisdiction." *Brownback*, 592 U.S. at 218 (quoting 28 U.S.C. § 1346(b)(1)) (emphases added).

merit element of a claim and a jurisdictional element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6). Or both. The label does not change the lack of subject-matter jurisdiction, and the claim fails on the merits because it does not state a claim upon which relief can be granted." *Id.* at 218 n.8.

## III. DISCUSSION

The Government moves to dismiss Count 2 and Count 3 under Rule 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim under the relevant tort laws of New York State ("New York"). First, the Government argues that these claims "are duplicative of Plaintiff's general negligence claim" in Count 1, (Def.'s Mot. at 1), and "should be dismissed because the alleged conduct is already encompassed in Plaintiff's general negligence claim and state law does not recognize separate and distinct torts for negligent infliction of emotional distress and negligent supervision," (*id.* at 3).

Second, as to Count 3, the Government makes two additional arguments. First, the Government argues that it is not cognizable under the FTCA because, as alleged, "no such claim is recognized against a private employer under New York law." (*Id.* 5.) In other words, the Government argues that in Count 3, Plaintiff has failed to allege an actionable claim for negligent hiring, negligent retention, negligent training, or negligent supervision under the laws of New York State.[7] (*See id.*) Second, the Government argues that Count 3 "falls squarely within the FTCA's discretionary

---

[7] The court understands Plaintiff to be alleging in Count 3 four separate but largely overlapping torts: negligent supervision, negligent training, negligent hiring, and negligent retention. *Cf. PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551, 568 (E.D.N.Y. 2021). Under New York law, each claim has distinct elements, and each claim requires both "different theories of negligence" and "different facts to be to be pleaded to

function exception," (*id.*), and "should be dismissed for lack of subject matter jurisdiction under 28 U.S.C. [§] 2680(a)," (*id.* at 6).

The court reviews each of the Government's arguments in turn.

### A.   Negligent Infliction of Emotional Distress (Count 2)

The Government argues that Count 2 is impermissibly duplicative of Count 1 and must be dismissed because "state law does not recognize NIED claims when another tort remedy is available." (*Id.* at 4.) In support, the Government argues that Plaintiff's claim for negligent infliction of emotional distress ("NIED") in Count 2 is based on the same factual allegations and seeks the same relief as Plaintiff's claim for general negligence in Count 1. (*Id.*) Plaintiff argues that he is entitled to plead alternative theories of negligence, and that at this early stage, Count 2 should proceed "so he may preserve this alternative theory of liability." (Pl.'s Opp. at 8.)

"In an FTCA action, courts are bound to apply the law of the state where the tort occurred—in this case, New York." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021). Under New York law, duplicative claims warrant dismissal. *See IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 290-91 (N.Y. 2023); *Brophy v. Big Bros. Big Sisters of Am., Inc.*, 224 A.D.3d 866, 869 (2d Dep't 2024).

In determining whether claims are "duplicative," New York courts "evaluate the nature of the injury, how the injury occurred[,] and the harm it caused." *IKB Int'l*, 40 N.Y.3d at 291.

---

make out each claim." *Montague v. Williams*, No. 21-CV-4054 (MKB), 2023 WL 2710320, at *12-13 (E.D.N.Y. Mar. 30, 2023) (enumerating each element of a negligence, negligent training, negligent supervision, negligent retention, and negligent hiring claim under New York state law, respectively) (collecting New York state case law), *appeal withdrawn*, No. 23-750, 2023 WL 7298782 (2d Cir. Aug. 18, 2023).

The Second Circuit has stated that under New York law, "'[t]wo claims are duplicative of one another if they 'arise from the same facts and do not allege distinct damages.'"" *In re 305 E. 61st St. Grp. LLC*, 130 F.4th 272, 282 (2d Cir. 2025) (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (quoting *Sitar v. Sitar*, 50 A.D.3d 667, 670 (2d Dep't 2008))); *accord Redd v. Brooklyn Friends Sch.*, 238 A.D.3d 1181, 1184 (2d Dep't 2025) ("A cause of action is properly dismissed as duplicative when it is based on the same facts and seeks essentially identical damages."). Two claims are not duplicative if "they rely on different facts." *Sitar*, 50 A.D.3d at 670.

As the Government points out, the allegations set forth under Plaintiff's cause of action for general negligence in Count 1 are nearly identical to the allegations set forth under his cause of action for NIED in Count 2. (*See* Def.'s Mot. at 4 (comparing Am. Compl. ¶¶ 83-97 with *id.* ¶¶ 98-113).) However, under New York law, it is not sufficient to merely look at the causes of action; instead, the court must look to the "pleadings' four corners" to evaluate the nature of the alleged injury and how it occurred, as well as the alleged harm that caused it. *See IKB Int'l*, 40 N.Y.3d at 291. For example, if a plaintiff has identified "an independent legal duty," and is not simply seeking to recover for emotional injury caused by a breach of the same legal duty, the "claim is not duplicative." *Id.* at 304.

Looking to the whole of the Amended Complaint, the court concludes that Count 2 must be dismissed as duplicative of Count 1. First, Count 1 and Count 2 rely on the same facts. To the extent that the Amended Complaint alleges facts in support of an NIED claim under New York law, those facts are pleaded and provided as support for Plaintiff's general negligence claim on the one

hand, or for Plaintiff's negligent supervision claim on the other.[8] For example, to support Plaintiff's claim for injuries suffered as a result of "dangerous and inhumane conditions of confinement" caused by the BOP's negligence, the Amended Complaint describes an eight-day period in which he was "forced to sleep on a urine-soaked bed while sick with COVID-19, . . . without medical care hot food, hot water, or sufficient heat." (Am. Compl. ¶¶ 27-28.) The Amended Complaint then realleges these identical facts, (*see id.* ¶¶ 56, 59), but here—presumably in support of Plaintiff's NIED claim—alleges that these same facts amount to an instance of gender-based discrimination, which "caused" Plaintiff "to suffer extreme emotional distress, humiliation, shame, trauma, and other emotional injury," (*id.* ¶ 65). Even if the court were to find that these facts amount to a prima facie case of NIED under New York law (it does not),[9] these facts show that the nature and circumstances around Plaintiff's claimed injuries and what caused them are identical. (*Compare id.* ¶¶ 27-28 *with id.* ¶¶ 56, 59.)

---

[8] So as not to confuse the issues, and because the Government does not argue that Count 2 is duplicative of Count 3, the court limits its analysis to Count 1 and Count 2. However, and for the sake of clarity, the court notes that Plaintiff may also properly seek to recover for the alleged exacerbation of his gender dysphoria and related emotional injuries under his cause of action for negligent supervision in the viable portions of his third cause of action (Count 3).

[9] To establish a prima facie case of NIED under New York law, a plaintiff must prove, in addition to the basic elements of negligence (Duty, Breach, Injury, Causation) that: (1) "the mental injury is a direct, rather than a consequential, result of the breach"; and (2) that "the claim possesses some guarantee of genuineness." *Cabrera v. Rallye Motors, LLC*, 215 A.D.3d 729, 730 (2d Dep't 2023) (quoting *Ornstein v. New York City Health & Hosps. Corp.*, 10 N.Y.3d 1, 6 (N.Y. 2008)). Absent specific types of negligence not at issue here, the guarantee of genuineness prong "'requires that the breach of the duty owed directly to the injured party must have at least endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own physical safety.'" *Id.* (quoting *Taggart v. Costabile*, 131 A.D.3d 243, 253 (2d Dep't 2015)). "Where the acts of a third person intervene between

In sum, even though Count 1 and Count 2 require different theories of negligence and different facts to be pleaded in order to state a claim under each theory, Plaintiff fails to identify facts he relies on for his negligence claim that are different from the facts he relies on for his NIED claim. As such, the court concludes that Count 1 and Count 2 arise from the same facts.

Second, Count 1 and Count 2 seek identical relief for the same alleged injuries caused by the same alleged negligence. (*Compare id.* ¶ 97 (alleging that Plaintiff suffered "PTSD, severe psychological and emotional injury, physical pain, fear, embarrassment, humiliation, shame, extreme emotional distress, loss of quality of life, violation of physical integrity, lost earning capacity, economic damages for medical and counseling expenses, and other harm") *with id.* ¶ 113 (alleging that Plaintiff suffered "PTSD, severe psychological and emotional injury, physical pain, fear, embarrassment, humiliation, shame, loss of quality of life, violation of physical integrity, lost earning capacity, economic damages for medical and counseling expenses, and other harm").) In other words, in Count 2, Plaintiff simply seeks to recover for emotional injuries caused by the alleged breach of the same legal duty alleged in Count 1. Accordingly, Count 2 is not an independent and non-duplicative cause of action. *See IKB Int'l,* 40 N.Y.3d at 290-91, 304. Any emotional injuries Plaintiff has suffered as a result of the alleged negligence of BOP employees may be properly recovered under Count 1. *See Fay v. Troy City Sch. Dist.,* 197 A.D.3d 1423, 1424 (3d Dep't 2021) (dismissing NIED claim as duplicative of negligence claim and noting plaintiff

---

the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed. In such a case, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence." *Id.* New York law does not require a plaintiff to "adequately allege extreme and outrageous conduct." *Taggart,* 131 A.D.3d at 256 (citing *Ornstein,* 10 N.Y.3d at 6).

"may recover for emotional distress caused by defendants' alleged conduct under the causes of action for negligence, negligent supervision and/or negligent retention"); *see also Brancaleone v. Mesagna*, 290 A.D.2d 467, 468-69 (2d Dep't 2002) (dismissing NIED claim as duplicative of defamation claim and noting plaintiff "may properly recover for the alleged emotional distress caused by the defamatory statements under the cause of action for defamation").

The court finds that Count 2 is duplicative of the viable portions of Count 1. Accordingly, the court dismisses Plaintiff's NIED claim.[10] *See Afifi v. City of New York*, 104 A.D.3d 712, 713 (2d Dep't 2013) (holding dismissal was warranted on a motion for summary judgment as to "the allegations of [NIED]" because they "were duplicative of the viable portions of the subject causes of action"); *see also PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551, 571 (E.D.N.Y. 2021) (applying New York law to dismiss NIED claim as duplicative of negligence claim because "[i]n addition to the overlapping conduct, the undifferentiated resulting injuries are essentially identical" and plaintiff "neither allege[d] distinct damages nor argue[d] that they differ").

### B. Negligent Hiring, Retention, Training, and Supervision (Count 3)

The court grants the Government's motion to dismiss Count 3 as to Plaintiff's negligent hiring, negligent retention, and negligent

---

[10] Plaintiff is correct that he is entitled to plead alternative theories of liability; however, a plaintiff's right to plead in the alternative is the "entitle[ment] to advance *inconsistent* theories in alleging a right to recovery." *Cohn v. Lionel Corp.*, 21 N.Y.2d 559, 563 (N.Y. 1968) (emphasis added). The court finds nothing "inconsistent" in the alleged facts or sought damages relating to Count 1 and Count 2; indeed, they are nearly identical. The court is bound to follow New York state law and where, as here, two causes of action allege identical facts and seek identical damages, it must dismiss the duplicative claim.

training claims. However, the court denies the Government's motion to dismiss Count 3 as to Plaintiff's negligent supervision claim.

The Government argues that Count 3 must be dismissed because: (1) it "falls squarely within the FTCA's discretionary function exception," (Def.'s Mot. at 5); (2) the Amended Complaint fails to state a claim for negligent supervision claim under New York law, (*id.*); and (3) Plaintiff's negligent supervision claim is duplicative of Count 1, (*id.* at 1). Plaintiff rejects each argument.

The court addresses each of these arguments in turn.

### 1. The FTCA's Discretionary Function Exception

While Plaintiff's negligent hiring, negligent retention, and negligent training claims are barred by the FTCA's discretionary function exception, Plaintiff's negligent supervision claim is not.

"The FTCA is the 'supreme' federal law addressing the United States' liability for torts committed by its agents. It supplies the 'exclusive remedy' for damages claims arising out of federal employees' official conduct." *Martin v. United States*, 145 S. Ct. 1689, 1700 (2025) (quoting *Hui v. Castaneda*, 559 U.S. 799, 806 (2010)). "The FTCA allows those injured by federal employees to sue the United States for damages. The statute achieves that end by waiving, in 28 U.S.C. § 1346(b), the federal government's sovereign immunity for 'certain torts committed by federal employees acting within the scope of their employment.'" *Id.* at 1695 (quoting *Brownback*, 592 U.S. at 212). "But the statute's waiver is subject to 13 exceptions that claw back the [G]overnment's immunity in certain circumstances." *Id.*; *see also* 28 U.S.C. § 2680 (enumerating exceptions). The FTCA's so-called "discretionary function" exception is one such claw back. *See* 28 U.S.C. § 2680(a). "Housed in subsection (a) of § 2680, this exception bars 'any claim' based on the exercise of an official's 'discretionary

function.'" *Martin*, 145 S. Ct. at 1698 (quoting 28 U.S.C. § 2680(a)).

"The Supreme Court has established a two-pronged framework known as the *Berkovitz/Gaubert* test for determining whether the discretionary function exception applies in the FTCA context." *Blecher v. Holy See*, 146 F.4th 206, 213 (2d Cir. 2025) (citing *Berkovitz*, 486 U.S. at 536-37; *Gaubert*, 499 U.S. at 322-23).[11] The first prong requires that the allegedly tortious conduct be "discretionary"; that is, "courts must consider the nature of the official's conduct and decide whether it 'involves an element of judgment or choice.'" *Martin*, 145 S. Ct. at 1704 (Sotomayor, J., concurring) (quoting *Gaubert*, 499 U.S. at 322); *accord Blecher*, 146 F.4th at 213. Importantly, this first prong "'is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,'" because "[i]n such circumstances, 'the employee has no rightful option but to adhere

---

[11] *Blecher* is the most recent binding authority on the FTCA's discretionary function exception. In *Blecher*, the Second Circuit held that the *Berkovitz/Gaubert* test barred plaintiff's failure to warn and to report claims under the Foreign Sovereign Immunities Act ("FSIA") where employees were alleged to have *complied* with a mandatory government policy. 146 F.4th at 222 ("[W]e conclude that this rule—that the FTCA's discretionary function exception bars the exercise of jurisdiction over claims stemming from employee conduct in compliance with a mandatory policy—also applies in the FSIA context to claims against a foreign sovereign."). In so holding, the Circuit relied heavily on case law interpreting the *Berkovitz/Gaubert* test in the FTCA context. *See id.* at 218-22. Because the Supreme Court has not yet interpreted the FSIA's analogous "exclusion" to the sovereign immunity of foreign governments, and because 28 U.S.C. § 2680(a) "contains virtually identical language to that contained" in the FSIA's discretionary function exclusion, the Circuit faithfully applied the FTCA's two-prong framework in this "analogous" context. *Id.* at 212 & n.3; *see also id.* at 213 n.5 (explaining the non-material distinction between "the FTCA's discretionary function *exception* and the FSIA's discretionary function *exclusion*") (emphases in original). There is no reason why *Blecher*'s reasoning should not apply in this case and the court is bound to follow the Circuit's binding precedent.

to the directive.'" *Martin*, 145 S. Ct. at 1704 (Sotomayor, J., concurring) (quoting *Gaubert*, 499 U.S. at 322). However, even where the challenged acts involve "an element of choice," the discretionary function exception "does not apply reflexively." *Id.* That is, upon finding that the allegedly tortious acts are "discretionary," courts must then move to the second prong and consider "whether 'the judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536). At this step, the Court has clarified that the discretionary function exception protects only those discretionary "governmental actions and decisions that are themselves 'based on considerations of public policy.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536-37). While different circuits have different standards for what constitutes discretionary acts "based on considerations of public policy," in this circuit, "decisions that require the [G]overnment to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding" are "based on considerations of public policy" and barred by the exception. *Blecher*, 146 F.4th at 225. However, the Second Circuit has held that "a government employee's 'absent-minded or lazy' conduct [does] not 'involve considerations of public policy'"; thus, such conduct is not protected by the exception. *Id.* at 225 (quoting *Coulthurst v. United States*, 214 F.3d 106, 111 (2d Cir. 2000)); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 476 (2d Cir. 2006) ("The negligent guard theory is a theory of liability under the FTCA over which the district court clearly has subject matter jurisdiction.").

In sum, the discretionary-function exception applies "only where an official's actions *both* involve an element of judgment *and* rely on public policy considerations." *Martin*, 145 S. Ct. at 1705 (Sotomayor, J., concurring) (citing *Gaubert*, 499 U.S. at 322-23; and *Berkovitz*, 486 U.S. at 536-37) (emphases added).

Plaintiff alleges that "BOP and supervisory BOP staff at the MCC and MDC were negligent in hiring, supervising, training, retaining, and disciplining staff, allowing them to torment [Plaintiff] for his gender identity and retaliate against him for his complaints, as well as ignore his requests for accommodations for his gender identity." (Am. Compl. ¶ 82.) In arguing for a broad application of the FTCA's discretionary function exception, the Government responds that the negligent hiring, retention, training, and supervision claims in this case should be dismissed because "[c]laims like the one here are 'consistently' found to fall squarely within the discretionary function exception's ambit." (Def.'s Mot. at 6 (quoting *Ojo v. United States*, No. 16-CV-4112 (MKB) (LB), 2019 WL 3852391, at *7 (E.D.N.Y. Aug. 15, 2019), *report and recommendation adopted*, No. 16-CV-4112 (MKB) (LB), 2019 WL 4602823 (E.D.N.Y. Sept. 23, 2019)).) But "consistent" findings that the discretionary function exception bars *other* negligent hiring, retention, training, and supervision claims, does not translate to a blanket ban of *all* negligent supervision claims. *See Riascos-Hurtado v. United States*, No. 09-CV-0003 (RJD) (VMS), 2015 WL 3603965, at *6 (E.D.N.Y. June 5, 2015) ("[I]t is not the case that all claims for negligent hiring or supervision are barred by the discretionary function exception.") (quoting *Gibbons v. Fronton*, 533 F. Supp. 2d 449, 455 (S.D.N.Y. 2008)). Nor do those findings necessarily mean that the negligent supervision claim in *this* case must be dismissed.

The court rejects the Government's invitation to apply a blanket ban on all negligent supervision claims and evaluates Plaintiff's negligent supervision claim under the two-pronged *Berkovitz/Gaubert* test.

> ### a. Plaintiff's Negligent Supervision Claim is Not Barred by the Discretionary Function Exception

Plaintiff's negligent supervision claim is not barred by the FTCA's discretionary function exception because the Amended Complaint plausibly alleges that in carrying out their allegedly tortious conduct, BOP employees and their supervisors violated specific mandatory directives.

The Government argues that Count 3 must be dismissed "because it is barred by the FTCA's discretionary function exception." (Def.'s Mot. at 1.) Plaintiff responds that Count 3 is not barred by the exception because the alleged negligent conduct "is non-discretionary [because] it is 'inconsistent with a specific mandatory directive.'" (Pl.'s Opp. at 5 (quoting *Cangemi*, 13 F.4th at 130).)

While a plaintiff "bear[s] the initial burden to state a claim that is not barred by the FTCA discretionary function exception," *Blecher*, 146 F.4th at 213, a plaintiff "can overcome a motion to dismiss premised on the discretionary function exception by showing that *either* (1) the United States' allegedly tortious act (or failure to act) was inconsistent with a 'specific mandatory directive'—i.e., a 'federal statute, regulation, or policy that specifically prescribes a course of action for the federal government to follow,' *or* (2) the allegedly tortious 'judgment or choice in question' is not 'grounded in considerations of public policy or susceptible to policy analysis,'" *Cangemi*, 13 F.4th at 130 (first quoting *Berkovitz*, 486 U.S. at 536, 544; and then quoting *Coulthurst*, 214 F.3d at 109 (2d Cir. 2000)). Where, as here, a plaintiff "seeking to overcome the discretionary function exclusion allege[s] the existence of a mandatory policy that specifically governs the challenged conduct, to satisfy *Berkovitz/Gaubert* prong one, [the plaintiff] must show that the allegedly tortious act 'violated the mandatory regulation.'" *Blecher*, 146 F.4th at 224 (quoting *Gaubert*, 499 U.S. at 324).

Plaintiff alleges that BOP employees violated two specific policy mandates: (1) the BOP Transgender Offender Policy's directive that BOP employees "must" provide "gender-appropriate under-garments . . . to transgender people in custody," (Am. Compl. ¶ 43; *see also id.* ¶¶ 40, 44-48 (describing alleged violations)); and (2) the BOP's "mandatory PREA policies," (*id.* ¶ 77), includ-ing the PREA Regulations, which "establish mandatory BOP policies for preventing and responding to discrimination, harass-ment, and abuse on the basis of sex and gender identity," (*id.* ¶ 40; *see also id.* ¶¶ 50-64, 82 (describing alleged violations)). Pursuant to those policies, Plaintiff alleges that BOP employees had "no rightful option" other than: (1) to provide him with gen-der-affirming undergarments and respond to his requests for the same, (*see id.* ¶¶ 40, 43, 47); and (2) to refrain from and to "re-port immediately . . . any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; re-taliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation," 28 C.F.R. § 115.61(a), (*see* Am. Compl. ¶¶ 40, 53, 77). Plaintiff alleges that BOP em-ployees failed to adhere to these two directives. (*See, e.g., id.* ¶¶ 47, 67.) And Plaintiff alleges that they failed to do so because "supervisory BOP staff at the MCC and MDC were negligent in . . . supervising . . . staff." (*Id.* ¶ 82.) Plaintiff also alleges that BOP supervisory employees knew (or should have known) of these violations because he registered numerous complaints—both verbal and in writing. (*See, e.g., id.* ¶¶ 4, 5, 45, 46, 62, 80-82.) Finally, Plaintiff also alleges that the BOP's supervisorial officials failed to act despite specific, mandatory policies in the PREA Reg-ulations regarding reporting and the handling of inmate reports. (*See, e.g., id.* ¶¶ 40, 77, 82.) For example, Plaintiff alleges that at least one supervisory employee—a "unit manager"—knew of his complaints because the manager cited those complaints as the

very reason for at least one instance of BOP's mistreatment of him. (*Id.* ¶ 63). Accordingly, Plaintiff's negligent supervision claims arising from violations of specific, mandatory BOP policies are not barred by the FTCA's discretionary function exception.

Moreover, the BOP's decision not to provide Plaintiff gender-affirming undergarments between August 2021 and April 2022, despite his repeated requests and numerous complaints, does not involve policy considerations. *See Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995) (in FTCA case, reversing dismissal of negligent supervision and negligent retention claims because the "[f]ailure to act after notice of illegal action does not represent a choice based on plausible policy considerations"). Likewise, the BOP's decisions concerning employees' failures to report the alleged, repeated instances of sexual harassment, discrimination, and retaliation against Plaintiff—including the decisions of the "unit manager"—cannot "be said to be based on the purposes that the [BOP's] regulatory regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 n.7. The BOP has a "zero-tolerance" policy for sexual harassment and for retaliation against inmates who report instances of sexual harassment. *See* 28 C.F.R. § 115.11 ("Zero tolerance of sexual abuse and sexual harassment"); PREA Regulations (providing a "written policy that implements zero tolerance toward all forms of . . . sexual abuse and sexual harassment"). *See also Herrera v. United States*, No. 20-CV-10206 (PKC), 2022 WL 902090, at *4 (S.D.N.Y. Mar. 27, 2022) ("[The PREA Regulations] provide a written policy that implements zero tolerance towards all forms of sexual activity, including sexual abuse and sexual harassment."). That policy specifically "require[s] all staff to report immediately . . . any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment [or retaliation] that occurred in a [BOP] facility." 28 C.F.R. § 115.61(a). The failure of BOP employees and supervisors, including the one "unit manager," to report or

otherwise act on Plaintiff's repeated complaints of sexual harassment, discrimination, and retaliation cannot be said to be in furtherance of these BOP policies.

The BOP's alleged inactions were either the result of the deliberate choices of BOP employees and supervisors not to adhere to the BOP's own mandatory directives, or they were motivated by laziness, inattentiveness, and/or absent-mindedness. Regardless of which theory turns out to be correct, in this circuit, the FTCA's discretionary function exception presents no bar to recovery. *See Blecher*, 146 F.4th at 225; *Coulthurst*, 214 F.3d at 111. *See also Triestman*, 470 F.3d at 475 (in pro se FTCA case, concluding the complaint should not have been dismissed pursuant to Rule 12(b)(1) where plaintiff's appellate brief asserted "that his 'injuries would have been prevented had the BOP adhered to its own regulations,' and, broadly, that the BOP 'is liable for neglecting its duty of care'").

In sum, Plaintiff alleges that the actions and inactions of BOP employees and their supervisors violated specific and identified mandatory directives: (1) the BOP Transgender Offender Policy, which requires that "gender-appropriate undergarments *must* be made available to transgender people in custody," (Am. Compl. ¶ 43 (citing the BOP Transgender Offender Policy) (emphasis added)); and (2) the PREA Regulations, which require all BOP staff to immediately report any suspicions of sexual abusive behavior against an inmate for investigation, (*id.* ¶ 53 (citing 28 C.F.R. § 115.61)). Because Plaintiff's negligent supervision claim is based on violations of specific, mandatory BOP policies, the court denies the Government's motion to dismiss Plaintiff's negligent supervision claim as barred by the FTCA's discretionary function exception.

23

b. *Plaintiff's Negligent Training, Hiring, and Retention Claims are Barred by the Discretionary Function Exception*

Plaintiff's allegations of negligent training, negligent hiring, and negligent retention cannot survive the discretionary function inquiry. Plaintiff alleges that "the United States and the BOP failed to enact policies and training to provide for safety, deliberately disregarding PREA obligations and failing to prevent serious harm." (*Id.* ¶ 79; *see also* Pl.'s Opp. at 6 ("The failure to train staff on [the PREA Regulations] resulted in BOP staff violating their duties.").) However, the Amended Complaint fails to plead "factual content that allows the court to draw the reasonable inference that the [Government] is liable for the misconduct alleged"—here, that the BOP "failed" to enact policies and train staff. *Iqbal*, 556 U.S. at 678. (Am. Compl. ¶ 79.)

Furthermore, while the PREA mandates that the BOP "*shall* train all employees who may have contact with inmates on its zero-tolerance policy for sexual abuse and sexual harassment," 28 C.F.R. § 115.31(a)(1) (emphasis added), *how* to conduct this training, and to what extent, is entirely within the BOP's discretion. Without factual allegations sufficient to support Plaintiff's strong assertions that the BOP "failed" to enact policies and "failed" to train staff, the most generous reading of the Amended Complaint is an allegation that the BOP's policies and training were insufficient. How and to what extent to train BOP officials on the needs of transgender inmates, gender identity, and sexual harassment is left to the BOP's discretion, and decisions made in the exercise of that discretion are clearly grounded in the policy of the BOP's regulatory regime. *Cf. Riascos-Hurtado*, 2015 WL 3603965, at *7 (concluding that the BOP's screening, hiring, and training of staff "require a balancing of competing objectives, and are of the nature and quality that Congress intended to shield from tort liability").

For similar reasons, the court finds that Plaintiff's negligent hiring and negligent retention claims are also based on discretionary conduct. An act is discretionary if it is not "compelled" by a federal statute or policy; in other words, an act is discretionary if an employee has some "rightful option" other than to "adhere to the directive" of a statute or regulation. *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). Although 18 U.S.C. § 4042 tasks the BOP with the "management and regulation of all Federal penal and correctional institutions," 18 U.S.C. § 4042(a), the statute does not dictate how the BOP should fulfill its hiring and retention duties. "The absence of specific guidelines of appropriate conduct by BOP officials in administering these duties, therefore, leaves judgment or choice to the BOP officials." *Scrima v. Hasty*, No. 97-CV-8433 (JGK), 1998 WL 661478, at *3 (S.D.N.Y. Sept. 24, 1998); *see also Needham v. United States*, No. 17-CV-5944 (ER), 2018 WL 3611944, at *4 (S.D.N.Y. July 27, 2018) (concluding that Section 4042(a) is discretionary because it "does not dictate how the BOP should achieve [the] goals" it lists).

In addition, the Amended Complaint has not set forth facts tending to show that the Government's alleged negligent training, negligent hiring, and negligent retention of staff were not grounded in public policy. Courts in this circuit have consistently found that "personnel decisions such as the hiring, retention, and training of correctional staff" implicate "policy considerations such as economy, efficiency, and safety." *Searles v. United States*, No. 21-CV-6570 (RA), 2022 WL 2829912, at *4 (S.D.N.Y. July 20, 2022) (dismissing plaintiff's negligent hiring, training, retention, and entrustment claims because the Government's "employment of unfit and incompetent prison staff and their failure to provide adequate security in the housing area . . . was clearly discretionary" and because "prison decisions regarding security matters implicate policy considerations such as economy, efficiency, and safety"); *accord Riascos-Hurtado*, 2015 WL

3603965, at *7 (finding that BOP's screening, hiring, and training of staff "require a balancing of competing objectives, and are of the nature and quality that Congress intended to shield from tort liability"); *Saint-Guillen v. United States,* 657 F. Supp. 2d 376, 387 (E.D.N.Y. 2009) ("'The hiring decisions of a public entity require consideration of numerous factors, including budgetary constraints, public perception, economic conditions, individual backgrounds, office diversity, experience and employer intuition.'") (quoting *Burkhart v. Wash. Metro. Area Transit Auth.,* 112 F.3d 1207, 1217 (D.C. Cir. 1997)).

In light of the Amended Complaint's pleading insufficiencies and the presumption that such personnel decisions fall within the discretionary function exception, the court dismisses Plaintiff's negligent hiring, negligent retention, and negligent training claims because they are barred by the FTCA's discretionary function exception. *See Saint-Guillen,* 657 F. Supp. 2d at 387.[12]

---

[12] Even if the discretionary function exception did not apply to these claims, the court would still dismiss them for failure to state a claim. Plaintiff has not stated a negligent hiring, a negligent training, or a negligent retention claim because he has not alleged any facts "relevant to the process that the United States undertook in hiring, screening, and training the correctional personnel in question." *Needham,* 2018 WL 3611944, at *4; *see also Riascos-Hurtado,* 2015 WL 3603965, at *6 (dismissing a negligent hiring claim where the plaintiffs failed to allege facts "suggesting that the BOP's hiring . . . strayed from . . . normal considerations"). While the Amended Complaint provides a historical overview of alleged PREA violations at the MCC and MDC, (*see* Am. Compl. ¶¶ 66-75), and then alleges that "BOP staff's gender identity harassment [of Plaintiff] . . . [in] violation of [the] PREA, is a result of a longstanding pattern of the BOP, MCC, and MDC refusing to . . . comply with mandatory PREA policies," (*id.* ¶ 77), these allegations are insufficient to create an actionable negligent hiring, negligent training, or a negligent retention claim under New York law. *See Nellenback v. Madison Cnty.,* No. 37, 2025 WL 1127776, ___ N.E.3d ___, at *4 (N.Y. Apr. 17, 2025) (holding that "[r]eferences to generalized norms or practices" or "culture" are not sufficient to satisfy a negligent supervision claim's constructive notice requirement).

## 2. New York Negligent Supervision

As Plaintiff's negligent supervision claim based on violations of specific, mandatory BOP policies does not fall within the FTCA's discretionary function exception, the court "must [now] ask whether, under [New York] state law, a private individual under like circumstances would be liable for the acts and omissions [Plaintiff] allege[s]." *Martin*, 145 S. Ct. at 1703. In other words, Plaintiff may prevail on the Government's motion to dismiss his negligent supervision claim "by demonstrating that . . . [New York law] would permit a cause of action for that misconduct to go forward." *Id.* at 1700.

The Government argues that "'New York law precludes a claim for negligent training or negligent supervision against an employer for acts taken within the scope of the employee's employment.'" (Def.'s Mot. at 5 (quoting *Salamone v. United States*, 618 F. Supp. 3d 146, 153 (S.D.N.Y. 2022)).) Because "Plaintiff pleads that the BOP employees' alleged acts and omissions were taken *within* the scope of their employment," the Government argues that "this claim should be dismissed for lack of subject matter jurisdiction since no such claim is recognized against a private employer under New York law." (*Id.* (emphasis added).) Plaintiff responds that New York law has no such requirement and even if it does, that he is nevertheless entitled to "plead alternative theories of liability." (Pl.'s Opp. at 4-5.) In making these arguments, neither party points to New York's controlling case law.

Where a federal court is "charged with state law adjudication, [the] ultimate source must be the law as established by the constitution, statutes, or authoritative court decisions of the state—and not federal courts' guesses as to what that law might be." *Borley*, 22 F.4th at 82. "If the relevant state law is established by a decision of the State's highest court, that decision is binding on the federal courts." *Animal Sci. Prods., Inc. v. Hebei Welcome*

*Pharm. Co.*, 585 U.S. 33, 44 (2018). In applying state law, federal courts are bound to apply the law as established by the state's highest court, even where "there is any perceived tension" with federal law. *Borley,* 22 F.4th at 82.

In this case, when applying New York state law, the court is bound to apply the law as established by the New York Court of Appeals. *Id.* In doing so, the court recognizes that, "a more recent decision regarding New York law from the New York Court of Appeals would trump an earlier decision from the Second Circuit." *Adebiyi v. Yankee Fiber Control, Inc.*, 705 F. Supp. 2d 287, 291 n.4 (S.D.N.Y. 2010). Accordingly, the court looks to the precedent of the New York Court of Appeals.

To state a claim for negligent supervision under New York law, a plaintiff must ultimately prove that:

> (1) the employer had actual or constructive knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm; (2) the employer knew or should have known that it had the ability to control the employee and of the necessity and opportunity for exercising such control; and (3) the employee engaged in tortious conduct on the employer's premises or using property or resources available to the employee only through their status as an employee.

*Moore Charitable Found. v. PJT Partners, Inc.*, 40 N.Y.3d 150, 157 (N.Y. 2023). These elements are *in addition* to the "well-settled" requirements in a negligence case that a plaintiff show "a duty owed to the plaintiff by the defendant, a breach of that duty, and injury proximately resulting therefrom." *Id.*; *accord Nellenback v. Madison Cnty.*, No. 37, 2025 WL 1127776, ___ N.E.3d ____, at *3 (N.Y. Apr. 17, 2025) (distinguishing a negligence action from a negligent supervision action and explaining in regard to the latter that "[w]hen an employer has notice of its employee's propensity to engage in tortious conduct, yet retains and fails to reasonably

supervise such employee, the employer may become liable for injuries thereafter proximately caused by its negligent supervision and retention").

In arguing that a negligent supervision claim under New York law requires an employee to be acting *within* the scope of employment, the Government relies only on federal district court cases preceding the New York Court of Appeal's decision in *Moore*. (*See* Def.'s Mot. at 5 (collecting cases).) To be clear, the Government cites no New York *state* cases on this issue and the federal cases interpreting New York tort law that the Government does cite predate *Moore*. (*Id.*) However, neither the New York Court of Appeals nor the Appellate Division, Second Department has required employees to have acted *outside* the scope of employment since *Moore*. *See, e.g.*, *Nellenback*, 2025 WL 1127776, at *7; *Redd*, 238 A.D.3d at 1184; *Bailey v. City of New York*, 228 A.D.3d 713, 715-16 (2d Dep't 2024); *Nickey v. City of Mt. Vernon*, 230 A.D.3d 590, 591 (2d Dep't 2024); *Tabchouri v. Hard Eight Rest. Co., LLC*, 219 A.D.3d 528, 533 (2d Dep't 2023). And as the Appellate Division, First Department recently observed, under New York law, "[l]iability for negligent hiring and retention is *not limited* to employees' actions within their scope of employment." *Waterbury v. New York City Ballet, Inc.*, 205 A.D.3d 154, 162 (1st Dep't 2022) (emphasis added). Negligent supervision— that is, a defendant's *own* failure to prevent the independent wrongdoings of employees that it is (or should be) aware of— should not be conflated with *vicarious liability* for employees' tortious acts on an employer's behalf. *Id.*

With these considerations in mind, the court considers each *Moore* element.

First, Plaintiff plausibly pleads each traditional negligence element. He alleges that under the PREA Regulations and the BOP Transgender Offender Policy, the BOP owed him certain duties of care as a person in custody and as a transgender inmate

29

(Duty). (*See* Am. Compl. ¶ 40.) He alleges that the BOP breached these duties "by subjecting him to extremely harmful harassment, abuse, and discrimination on the basis of his gender identity," in violation of the PREA Regulations, (*id.* ¶ 105), and by denying him medical care in violation of the BOP Transgender Offender Policy, (*id.* ¶¶ 40-43) (Breach). Plaintiff alleges that through these actions, BOP staff violated BOP policy, exacerbated his gender dysphoria, and caused him to suffer emotional distress and other emotional injuries (Injury). (*Id.* ¶ 65.) And Plaintiff asserts that his injuries "occurred . . . due to the failure" of BOP staff to follow the BOP's mandatory regulations and policies (Causation). (*Id.* ¶¶ 81-82.)

Plaintiff also satisfies each *Moore* element for negligent supervision. Plaintiff alleges that the aforementioned violations of specific, mandatory BOP policies and his resulting harms occurred (and continued to occur for the duration of his incarceration) because BOP employees and supervisors were careless or inattentive in failing to report known instances of sexual harassment, discrimination, and retaliation and that they were careless or inattentive in failing to properly respond to Plaintiff's repeated reports of policy violations and mistreatment. (*See id.* ¶¶ 40-41, 81-82.)

Plaintiff has satisfied the first *Moore* element because he has met his burden to plausibly allege the BOP's actual or constructive notice. Plaintiff's allegations that he: "complained about the discrimination he faced at the hands of BOP staff," (*id.* ¶ 60); "filed an administrative grievance" regarding the same, (*id.* ¶ 62); and that he was told by a "unit manager" that BOP staff had refused to return his towel because they believed Plaintiff "had complained to his attorneys" about their mistreatment of him, (*id.* ¶ 63), demonstrate the BOP's awareness of its employees' sexual harassment, retaliation, and denial of basic medical care as a transgender inmate, which allegedly caused Plaintiff's injuries.

Indeed, the Amended Complaint alleges that at least one specific BOP supervisory employee—the unit manager—had actual knowledge both of BOP employees' alleged, prohibited sexual discrimination, harassment, and retaliation, and of Plaintiff's complaints reporting this mistreatment. In any event, "New York law establishes that a negligent supervision claim cannot be defeated by an employer's unreasonable ignorance." *Martin v. Nieuw Amsterdam Prop. Mgmt., LLC*, No. 22-CV-3506 (ARR) (TAM), 2025 WL 1504124, at *10 (E.D.N.Y. May 27, 2025) (relying on *Moore*). Plaintiff filed numerous complaints both verbal and in writing. This is enough to satisfy the first *Moore* element of constructive notice.

Plaintiff has also satisfied the second *Moore* element: the BOP knew or should have known that it had the ability to control its employees, and the BOP knew or should have known of the necessity for exercising such control. Plaintiff asserts that the Government, the BOP, and BOP staff were aware of the risk of harm to transgender people in federal custody, as evidenced by the BOP's promulgation of special guidelines and mandatory standards of care for transgender inmates, (Am. Compl. ¶ 79), and of the risks associated with sexually abusive behavior targeted at transgender inmates, as evidenced by its zero-tolerance policy, (*id.* ¶ 40). In addition, Plaintiff alleges that BOP staff knew (or should have known) that he was at particular risk due to his history of gender-based abuse, his gender dysphoria, and his unique medical needs as a transgender person, as they were documented in his medical records. (*Id.* ¶¶ 3, 25-26, 54-55.) The court finds that the BOP's implementation of mandatory guidelines for the treatment of transgender inmates in federal custody, and of "mandatory . . . polices for preventing and responding to discrimination, harassment, and abuse on the basis of sex and gender identity," indicate the BOP's recognition of the necessity of this control. (*Id.* ¶¶ 40-41, 81-82.) Plaintiff's medical records and the BOP's mandatory policies and treatment guidelines for

transgender inmates are enough to show that the BOP knew of the necessity and opportunity for exercising control of its employees.

Finally, Plaintiff satisfies the third *Moore* element because the allegedly tortious conduct occurred on BOP premises; specifically, the challenged acts and omissions occurred during Plaintiff's incarceration at the MCC, the MDC, or both.

In sum, Plaintiff plausibly alleges a negligent supervision claim under New York law because he has plausibly alleged that the "[BOP]'s own failure to prevent [its] employees' independent wrongdoing that it [was] aware of" caused his injuries. *Waterbury*, 205 A.D.3d at 162. (*See* Am. Compl. ¶¶ 80-82 (alleging that violations of BOP policies and Plaintiff's resulting harms occurred "due to the failure of high ranking and supervisorial officials at [the] MCC and MDC" to "respond to previous allegations of mistreatment due to [Plaintiff's] gender" and "his requests for accommodations for his gender identity").)

Accordingly, and for the above reasons, the court finds that the Amended Complaint plausibly pleads a cause of action for negligent supervision under the laws of New York state. *Cf. Caldwell v. City of New York*, No. 24-CV-677, 2025 WL 1466271, at *2 (2d Cir. May 22, 2025) (citing *Moore*, 40 N.Y.3d at 157) (summary order).

### 3. Plaintiff's Negligent Supervision Claim is Not Duplicative of Count 1

Looking at the Amended Complaint as a whole, Plaintiff's negligent supervision claim is not duplicative of his general negligence claim (Count 1) because each claim relies on different facts and seeks damages based on the alleged breach of different duties. *See Sitar*, 50 A.D.3d at 670 (explaining that two claims are not duplicative if "they rely on different facts"); *IKB Int'l*, 40 N.Y.3d

at 304 (explaining that a "claim is not duplicative" if it identifies "an independent legal duty").

Count 1 relies on factual allegations relating to Plaintiff's conditions of confinement. (*See, e.g.*, Am. Compl. ¶¶ 36 (black mold), 31-32 (foul drinking water), 33 (electrical outages, rats, broken kitchen equipment).) Plaintiff's negligent supervision claim, on the other hand, relies on factual allegations relating to: (1) the actions of BOP staff in violation of specific, mandatory BOP policies, (*see, e.g., id.* ¶¶ 42-45 (denied gender-affirming underwear), 50-53 (harassed with transphobic, hateful remarks), 60-61 (retaliated against for reporting mistreatment), 62 (discarded complaint)); and (2) the claimed inactions of BOP supervisory employees who knew (or should have known) of unlawful conduct and failed to respond as required by specific, mandatory BOP policies, (*see, e.g., id.* ¶¶ 46-47 (failure to act on or respond to Plaintiff's requests for gender-affirming underwear), 63 (failure to act on retaliation against Plaintiff for reporting mistreatment), 81 (failure to act on or respond to allegations of gender-based mistreatment against Plaintiff)).

In addition, whereas Count 1 relies on the alleged breach of the BOP's duty to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" under 28 U.S.C. § 4042, Plaintiff's negligent supervision claim relies on the alleged breach of the BOP's duties to all inmates to adhere to, implement, and supervise its zero-tolerance policy for sexually abusive behavior under the PREA Regulations, and the BOP's duties to transgender persons in custody under the BOP Transgender Offender Policy. (*Compare id.* ¶ 85 (quoting 18 U.S.C. § 4042(a)(2)) and *id.* ¶ 91 *with id.* ¶¶ 23, 40-41, 43, 53, 105.)

Finally, in Count 1, Plaintiff seeks damages for injuries suffered as a result of BOP's "failure to mitigate . . . inhumane and harmful

conditions [of confinement]." (*Id.* ¶ 92.) In his negligent supervision claim, however, Plaintiff seeks to recover from injuries he suffered as a result of BOP employees' careless or inattentive failures to report or otherwise respond to known violations of the BOP's mandatory policies, and BOP employees' careless or inattentive failures to adhere to mandatory BOP regulations regarding the supervision and reporting of sexually abusive behavior. (*See, e.g., id.* ¶¶ 81-82.)

The court finds that the negligent supervision portion of Count 3 based on violations of specific, mandatory BOP policies is not duplicative of Count 1. Under New York law, claims for general negligence and negligent supervision require different theories of negligence and different facts, and the Amended Complaint relies on different facts to support each claim. Accordingly, and for the reasons explained above, the court concludes that the viable portions of Count 3—Plaintiff's negligent supervision claim based on violations of specific, mandatory BOP policies—are not duplicative of Plaintiff's general negligence claims in Count 1 and that a New York state court would allow Plaintiff's negligent supervision claim to proceed as an independent cause of action. *See, e.g., Fay*, 197 A.D.3d at 1424 (dismissing premises liability and [NIED] claims as duplicative of negligence claim, but sustaining separate causes of action for negligence, negligent supervision, and negligent retention); *Torrey v. Portville Cent. Sch.*, 2020 WL 856432, at *2-3 (N.Y. Sup. Ct. Feb. 21, 2020) (recognizing one cause of action against defendant school district for negligent hiring, retention, supervision, and direction, and another cause of action for negligence and/or gross negligence); *accord Montague v. Williams*, No. 21-CV-4054 (MKB), 2023 WL 2710320, at *12-13 (E.D.N.Y. Mar. 30, 2023) (finding plaintiffs' causes of action for negligence, gross negligence, willful misconduct, negligent supervision and training, negligent retention, and negligent hiring "are not duplicative" under New York law), *appeal*

*withdrawn,* No. 23-750, 2023 WL 7298782 (2d Cir. Aug. 18, 2023).

For the reasons explained above, while Plaintiff may proceed on a theory of negligent supervision against the Government, his claims for negligent hiring, negligent retention, and negligent training are dismissed as barred by the discretionary function exception to the FTCA. As to Count 3, Plaintiff may proceed on his claim for negligence supervision to the extent—and only to the extent—that this cause of action arises from BOP employees and their supervisors' alleged violations of: (1) mandatory BOP policies relating to the treatment and care of transgender inmates, including the BOP Transgender Offender Policy's directive that gender-appropriate undergarments must be made available to transgender people in custody, (Am. Compl. ¶ 43); and (2) the BOP's mandatory PREA Regulations implementing the BOP's zero-tolerance policy for sexual abuse and sexual harassment, and upholding the right of people in custody to be free from retaliation for reporting mistreatment on the basis of sex or gender, (*id.* ¶¶ 40, 81-82).

\* \* \*

## IV. CONCLUSION

For the reasons set forth above, the Government's motion to dismiss is GRANTED in part and DENIED in part. The Government's motion to dismiss Count 2 is GRANTED. The Government's motion to dismiss the negligent hiring, negligent retention, and negligent training portions of Count 3 is GRANTED. The Government's motion to dismiss the negligent supervision portion of

Count 3 is DENIED. In light of this Memorandum and Order, the case proceeds as to Count 1 and to Count 3, as modified. The parties are DIRECTED to continue with discovery under the supervision of Magistrate Judge Taryn A. Merkl.

SO ORDERED.

Dated:    Brooklyn, New York
          September 12, 2025

                                      s/Nicholas G. Garaufis
                                      NICHOLAS G. GARAUFIS
                                      United States District Judge